1  Clay Robbins III, Esq.  (SBN  #101275)
   **MAGAÑA, CATHCART & McCARTHY**
2  1801 Avenue of the Stars, Suite 600
   Los Angeles, California  90067-5908
3  (310) 553-6630; Fax: (310) 785-9143

4  Charles W. Miller, Esq. (TBN 24007677)
   Michael E. Heygood, Esq. (TBN 00784267)
   Eric D. Pearson, Esq. (TBN 15690472)
5  **Heygood, Orr, Reyes, Pearson & Bartolomei**
   2331 W. Northwest Highway, 2nd Floor
6  Dallas, Texas 75220
   Tel: (214) 526-7900; Fax (214) 526-7910
7
   Attorneys for Plaintiff
8  INFUTURIA GLOBAL LTD.

9
                    UNITED STATES DISTRICT COURT
10
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12  INFUTURIA GLOBAL LIMITED, a          )    Case No. C09-02219
    British Virgin Islands Corporation   )
13                                       )
                                         )
14          Plaintiff,                   )
                                         )
15      v.                               )    **AGREED FINAL JUDGMENT**
                                         )    **CONFIRMING ARBITRATION**
16                                       )    **AWARD**
                                         )
17  YISSUM RESEARCH AND                  )
18  DEVELOPMENT COMPANY AND              )
    THE HEBREW UNIVERSITY                )
19  OF JERUALEM, an Israeli corporation, )
                                         )
20          Respondent.                  )

21      Plaintiff, INFUTURIA GLOBAL LIMITED originally filed suit in California State

22  Court on October 26, 1998 against Sequus Pharmaceuticals, Inc., the Hebrew University of

23  Jerusalem and Yechezekel Barenholz.  The lawsuit stemmed from alleged interference

24  with a License Agreement between Plaintiff and Respondent Yissum Research

25  Development Company of the Hebrew University of Jerusalem ("Yissum").  Said

26  agreement contained an arbitration clause mandating arbitration of certain disputes

27  ORIGINAL

28

1  between Plaintiff and Yissum.  On May 27, 1999, Yissum, then a non-party, filed an

2  Application to Stay the Litigation and Compel Arbitration.

3      On July 14, 1999, the California state court entered an Order compelling arbitration

4  and staying litigation under CCP § 1281.4.   The dispute between Plaintiff and Yissum was

5  then submitted to arbitration in Israel.  On    May 21, 2006, the arbitrator, Judge (ret.)

6
   Amnon Strashnov, rendered his opinion.   A true and correct copy of the English
7
   translation of the decision is attached hereto as Exhibit "A."   Plaintiff has filed a verified
8
9  petition for this Court to confirm Judge Strashnov's arbitration decision.   Yissum filed a

10  Response agreeing to have the Arbitration Decision confirmed by the Court.   The parties

11  have now filed an agreed motion to confirm the arbitration decision.   This Court is of the

12  opinion that such motion is well taken and hereby confirms the arbitration award as set

13
   forth herein.
14
15      **IT IS HEREBY ORDERED, ADJUDGED and DECREED** that the written

16  document entitled "Arbitration Decision" attached as Exhibit "A," is confirmed by this

17  Court.

18      **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all factual

19  findings, conclusions and decisions of Judge Strashnov, as set forth in the Arbitration

20  Decision, shall have the same legal force and effect as a judgment of this Court.

21
       **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that each party
22
23  shall bear their own costs and attorneys' fees.

24      SIGNED this _14_ day of ___July___, 2009

25

26                                    _Susan Illston_

27                                    JUDGE PRESIDING

28

APPROVED AS TO FORM:

1

2

3    **MAGAÑA, CATHCART & McCARTHY**

4

5    _____
     Clay Robbins III, Esq.

6    Attorney for Plaintiff
     INFUTURIA GLOBAL LIMITED

7

8

9    **DUFFY & GUENTHER, LLP**

10

11   _____
     Debra Gemgnani Tipton

12   Attorneys for Respondent
     YISSUM RESEARCH AND DEVELOPMENT

13   COMPANY OF THE HEBREW UNIVERSITY
     OF JERUSALEM

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Clay Robbins III, Esq.   (SBN  #101275)
    **MAGAÑA, CATHCART & McCARTHY**
    1801 Avenue of the Stars, Suite 600
2   Los Angeles, California  90067-5908
    (310) 553-6630; Fax: (310) 785-9143
3

    Charles W. Miller, Esq. (TBN 24007677)
4   Michael E. Heygood, Esq. (TBN 00784267)
    Eric D. Pearson, Esq. (TBN 15690472)
5   **Heygood, Orr, Reyes, Pearson & Bartolomei**
    2331 W. Northwest Highway, 2nd Floor
6   Dallas, Texas 75220
    Tel: (214) 526-7900; Fax (214) 526-7910
7

    Attorneys for Plaintiff
8   INFUTURIA GLOBAL LTD.

9
                    UNITED STATES DISTRICT COURT
10
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12  INFUTURIA GLOBAL LIMITED, a          )        Case No. C09-02219
    British Virgin Islands Corporation   )
13                                        )
                                          )
14          Plaintiff,                    )
                                          )
15       v.                               )        **AGREED MOTION TO**
                                          )        **CONFIRM ARBITRATION**
16                                        )        **AWARD**
                                          )
17  YISSUM RESEARCH AND                   )
    DEVELOPMENT COMPANY OF                )
18  THE HEBREW UNIVERSITY                 )
19  OF JERUALEM, an Israeli corporation,  )
                                          )
20          Respondent.                   )

21          COMES NOW INFUTURIA GLOBAL LIMITED, Plaintiff, and YISSUM

22  RESEARCH AND DEVELOPMENT COMPANY OF THE HEBREW UNIVERSITY

23  OF JERUSALEM, Respondent, and file this AGREED MOTION TO CONFIRM

24  ARBITRATION AWARD and would respectfully show unto the Court as follows:

25

26

27

28  ORIGINAL

Plaintiff, INFUTURIA GLOBAL LIMITED originally filed suit in California State Court on October 26, 1998 against Sequus Pharmaceuticals, Inc., the Hebrew University of Jersualem and Yechezekel Barenholz. The lawsuit stemmed from alleged interference with a License Agreement between Plaintiff and Respondent Yissum Research Development Company of the Hebrew University of Jerusalem ("Yissum"). Said agreement contained an arbitration clause mandating arbitration of certain disputes between Plaintiff and Yissum. On May 27, 1999, Yissum, then a non-party, filed an Application to Stay the Litigation and Compel Arbitration.

On July 14, 1999, the California state court entered an Order compelling arbitration and staying litigation under CCP § 1281.4. The dispute between Plaintiff and Yissum was then submitted to arbitration in Israel. On May 21, 2006, the arbitrator, Judge (ret.) Amnon Strashnov, rendered his opinion. A true and correct copy of the English translation of the decision is attached hereto as Exhibit "A." On May 20, 2009, Plaintiff filed a Verified Petition to Confirm Judge Strashnov's arbitration decision. On June 10, 2009, Yissum filed its Response to Plaintiff's Petition, agreeing to have the Arbitration Decision confirmed by the Court and a judgment entered in conformity therewith. The Parties are therefore in agreement that the Arbitration Decision should be confirmed by the Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiff and Respondent respectfully request that the Court grant the following relief:

(1)     the written document entitled "Arbitration Decision" attached hereto as Exhibit "A," be confirmed by this Court;

(2)     all factual findings, conclusions and decisions of Judge Strashnov, as set forth in the Arbitration Decision, be given the same legal force and effect as

1      a judgment of this Court;

2     (3)     That each party shall bear their own costs and attorneys' fees;

3     (4)     All further relief, in law or equity, to which the Plaintiff and Respondent

4      may show themselves to be justly entitled.

5

6

DATED:  July __6__, 2009

7

8             **MAGAÑA, CATHCART & McCARTHY**

9

10             Clay Robbins VI, Esq.

11             Attorney for Plaintiff
               INFUTURIA GLOBAL LIMITED

12

13

14             **DUFFY & GUENTHER, LLP**

15

16             Debra Gemgnani Tipton

17             Attorneys for Respondent
               YISSUM RESEARCH AND DEVELOPMENT

18             COMPANY OF THE HEBREW UNIVERSITY OF
               JERUSALEM

19

20

21

22

23

24

25

26

27

28

Before the Arbitrator:                          Case Bar-201-04
**Judge (ret.) Amnon Strashnov**

In the matter between:

> **Yissum Research Development Company of the**
> **Hebrew University of Jerusalem**          <u>Plaintiff</u>
> represented by its legal representatives
> Attorneys Eli and Itay Zohar              (Counter Defendant)

> and

> **Infuturia Global Limited**               <u>Defendant</u>
> represented by its legal representatives
> Attorneys Y. Sheftel and D. Beckerman      (Counter Plaintiff)

## <u>Arbitration Decision</u>

### <u>Background and Agreements</u>

1.  The Plaintiff is a company registered in Israel, under full control of the Hebrew
    University in Jerusalem, and it serves as an extension of the University for the
    commercial implementation of scientific researches, performed by the University's
    researchers (hereinafter: Yissum or Plaintiff).
    The Defendant is a company registered abroad, owned by Mr. Seymour Kurtz,
    citizen of the USA, that entered with the Plaintiff an agreement for the research and
    development of Patent No. 314 (hereinafter: Infuturia or Defendant). The subject of
    the agreement was the development of a technology designated as Lipid
    Replacement Therapy.

2.  The Patent 314 (or 314 Liposome) was based on a treatment for the replacement of
    lipids in the blood (Lipid Replacement Therapy), the purpose of which was the
    quick transport of cholestrol to the liver, where it is broken up and removed from
    the body. Liposomes are structures, or small bubbles, of various sizes, composed of
    fats or fat droplets, and they are capable of transporting drugs in the blood cycle.
    The 314 Liposome patent was based on a discovery, whereby cholestrol free
    liposomes are injected until the point of saturation, and are then removed from the

1



ORIGINAL

body together with the cholestrol they absorbed (see Barenholz Deposition – P/3, section 78.3).

3.  Patent 314 was invented by Prof. Yeheskel Barenholz and by Eli Yehiel, and was registered as a patent in the USA. Owner of the patent license was the company LTI. In time, LTI waived its rights to the patent and returned it to the Plaintiff, whereby Prof. Barenholz is one of the researchers working for the Hebrew University in Jerusalem.

    On April 15, 1989, an article appeared in the New York Times in the USA, reporting on the existence of patent 314, that contains a method for the delay of the aging process and for an increase of fertility in animals (P/9). Mr. Seymour Kurtz, an American lawyer and businessman, read that report, and, finding great interest in it, contacted Prof. Barenholz. The two developed a close relationship on the subject of the development of the 314 Liposome, as will be described in further detail below.

4.  On March 19, 1990, the parties signed a contract, whereby the Plaintiff would handle the scientific aspect of the development of patent 314, including testing on animals, with the purpose of developing the product and distributing it to the public. The Defendant was to deal with the commercial aspect of the project, and to care about its marketing and commercialization. In consideration therefore, the Plaintiff granted the Defendant exclusive license rights for the commercialization and distribution of the patent.
    The Defendant, on the other hand, undertook to pay the Plaintiff royalties, as specified in the agreement (hereinafter – Agreement or License Agreement, Annex 1 to the Kurtz Deposition, D/23).

5.  Further to the first agreement, the parties concluded a number of additional agreements, and they exchanged a large number of letters. The main additional agreements, which were significant for the decision in this case, are specified hereinafter:

    a.  Shortly following the conclusion of the License Agreement on March 19, '00 *[sic! – should be "1990" - Translator's Note]*, possibly even on the same day, the parties signed an "Amendment to the Agreement of March 19, 1990", stating, among others, that Yissum would continue to perform tests and research for Infuturia in connection with the agreement of March 19, 1990, under the supervision of Prof. Barenholz, and would submit reports pertaining to the results of said research. For the execution of said tests and research activities, the Defendant would pay the Plaintiff a total of $ 47,175. There is no disagreement between the parties that Kurtz in fact paid this amount to Yissum. The aforesaid agreement does not bear any date (Annex 21 to the Kurtz Deposition: hereinafter – "Amendment to the Agreement".

2

b. On December 2, 1993, the parties arranged and concluded an additional document, designated by all as "Letter of Agreement" (Annex 27 to the Kurtz Deposition). Pursuant to said letter, Yissum would continue to conduct research for Infuturia under identical conditions to those agreed upon in the License Agreement of March 19, 1990.
As consideration, Infuturia would pay Yissum a total of $ 54,825 (including overhead). The parties signed the Letter of Agreement, and they agree that the Defendant paid the full aforesaid payment to the Plaintiff.

6. The evidence shows that beyond the amounts determined in said documents, Kurtz paid Yissum additional amounts, in accordance with the requests and pleadings of Yissum and its representatives, in particular Prof. Barenholz.
Among others, Kurtz paid, as asserted by him, an amount of $ 50,000 for the Milan Trials (section 19 of his Deposition); $ 15,000 for the purchase of lipids (section 68.a.6 of his Deposition); a total of $ 53,250 for additional "exceptional payments", as asserted by Kurtz (section 68.a.8. of his Deposition), and more. All in all, Kurtz, according to his assertion, paid more than 550 Thousand dollars for all the trials (his Deposition, D/23, section 52).

7. The evidence of the case shows in fact that Yissum raised, from time to time, additional demands for payments from Infuturia, even beyond what had been agreed upon in writing. Hereinafter a number of appropriate examples:

a. On June 2, 1993, in a letter he sent to Kurtz, Barenholz requested to be paid $ 58,000 as a contribution to his lab for the operation, as follows:
"For my laboratory contribution for the operation we will need 50,000$..."
(Annex 25 to the Kurtz Deposition).

b. In a letter of February 8, 1995, Barenholz requests $ 25,000 from Kurtz, to be paid in three installments, for cholestrol kits, as well as for wages to be paid employees working in the project (Annex 30 of the Kurtz Deposition).

c. In a letter of April 13, 2005 (Annex 31), Barenholz asks whether Kurtz had transferred the $ 10,000, which had been agreed in the past, and he notes that in order to continue the project he would need support in the near future. In addition, Barenholz states in his letter that he would soon have used up the entire budget allocated by Infuturia for the research (including the special amount of $ 30,000), and that "a solution must be found as to how to continue".

## Details of the Trials

8. Following the conclusion of the License Agreement on March 19, 1990, Yissum began with the performance of various trials, as detailed below:

3

a. In the first phase, during the years 1991 – 1992, canine trials were performed, as set forth in the deposition of the person responsible for the trials, Prof. Yeheskel (Hezi) Barenholz (P/3, sections 15 – 22). These trials encountered problems, when the use of high dosages caused a high level of toxicity in blood, and to the side effect of damage to the liver, as Prof. Barenholz testified accordingly, and as can be seen in the final report of this research, regarding the first canine trial (Exhibit 3 of the Plaintiff's exhibits).

b. The ensuing phase of the trials was the "Milan Trials", performed in 1992, during which trials were performed on two humans (one of them being Kurtz's son-in-law), in the city of Milan, Italy. As to details of the trials – see the Barenholz Deposition (P/3, sections 23 – 35), as well as his testimony during the arbitration procedure. See also reports of the Italian physician who handled the trials, Dr. D'Affra (Annexes 22 and 23 of the Deposition, D/23).

c. In the third phase, in December 1992, human trials were conducted on humans in Jerusalem, on people or patients who agreed to participate in the trial, which will be designated hereinafter as: "Jerusalem Trials" (see P/3, sections 36 – 46).

These trials were conducted in reliance on an additional agreement signed by the Defendant, this time with the company "Hadasit", affiliated with the Hadassah Hospital in Jerusalem, on November 18, 1993 (Annex 26), and for which the Defendant undertook to pay a total of $ 115,000 – which the Defendant paid in its entirety, or for the most part, to Hadasit.

Also in respect to these "Jerusalem Trials", rather detailed reports were issued by Prof. Tova Chajzek-Shaul, who was responsible for the trials (Annexes 69, 70, 71 of the Kurtz Deposition, D/23), and they were addressed to Mr. Kurtz. See in the matter of the transfer of the report to Kurtz the testimony of Mr. Ury Litvin, the Plaintiff's General Manager, on pages 639-640 of the protocol.

### The "Third Addendum" Agreement

9. On December 29, 2005 *[sic! - should be "1995" - Translator's Note]*, the parties signed an additional agreement entitled "Third Addendum to the License Agreement", which serves as the main basis for the claim in the present case (hereinafter - "Third Addendum"). Therefore I will relate to it in detail. The preamble to the Third Addendum specifies agreements that the parties had concluded in the past, of March 19, 1990, and December 2, 1993. The Plaintiff's main undertaking, to continue and perform the scientific research regarding the 314 Liposome, including tests on humans and animals, and submission of respective reports to the Defendant, are specified in Section A of the document, as follows:

"A. Licensor will continue to perform the scientific investigations, research and testing with respect to the liposome therapy, including the work on Human subject Testing and animal testing in which it is currently engaged and will provide licensor with reports respecting such investigations, research and testing as required by the License Agreement" (Annex 48 D/23).

10.   In consideration therefore, the Defendant undertook to pay the Plaintiff an amount of $ 125,000, on the dates set forth in Section C of the Third Addendum. There is no dispute between the parties that the Defendant paid the Plaintiff $ 15,000. As claimed by the Plaintiff, the Defendant's debts accumulated to an amount of $ 155,000, and on May 14, 1997, Yissum informed Infuturia that it *[Infuturia - Translator's Note]* had committed a fundamental breach of the agreement, and if said breach would not be corrected within 60 days - the agreement would be canceled (Plaintiff's exhibits - exhibit 23). On November 19, 1997, Yissum sent a final notification of cancellation of the License Agreement (Plaintiff's exhibit 27; hereinafter - "Notification of Cancellation").

## The Parties' Claims

11.   The Plaintiff claims that the amount of $ 125,000, subject of the "Third Addendum" that had been signed by the Parties (minus $ 15,000, that had been paid, as aforesaid), was never paid, despite repeated assurances by Kurtz to pay this amount, as follows from the documents and correspondence in the case (see the Ury Litvin Deposition, P/8, and the annexes specified therein).

The Plaintiff's legal representatives, attorneys Eli and Itay Zohar, further argue that all the amounts paid by Kurtz after the conclusion of the Third Addendum on December 29, 1995, were not paid on account of financial obligations arising from said document, but following other and additional undertakings by Kurtz, such as overhead, various materials, lab maintenance, etc.

The Plaintiff substantiates its arguments, among others, on document 23 of the Plaintiff's exhibits, where Mr. Litvin of Yissum, on May 14, 1997, explicitly demanded payment (by email message) of the remaining debt of $ 155,000, while Kurtz never reacted to this letter, and thus never denied the scope of the debt.

The Plaintiff further argues that the various amounts paid by the Defendant after the conclusion of the Third Addendum, amounting to $ 89,000, were "maintenance payments" for the period following May 1996, after the Defendant was obligated to bear these expenses amounting to monthly $ 8,000 (including overhead). This being so, the Plaintiff's legal representatives argue, that only "$ 15,000 may be allocated to the Third Addendum, the remainder are good money for maintenance fees" (section 57 of the Plaintiff's summation of September 25, 2005).

5

12. As argued by the Defendant's legal representatives, attorneys Y. Sheftel and D.
Beckerman, the Defendant paid, through Mr. Kurtz, an amount of $ 92,545, as
specified in section 48 of his Deposition (D/23), on account of the Third Addendum
agreement of December 29, 1995, and in reliance on it (section 29 of the
Defendant's written summation).
As argued by the Defendant's legal representatives, Kurtz paid the Plaintiff, during
all the years, all the funds he was requested to pay in accordance with the
agreements that he had signed. In addition, he paid additional funds, according to
the Plaintiff's repeated requests, brought forward mainly through letters written by
Prof. Barenholz and others, all this without written agreements. They argue that
Kurtz had turned into a "dairy cow", from which the Plaintiff, through its various
representatives, was "pumping" funds in an unlimited and unrestricted fashion, like
a bottomless pit (section 32 of Deposition D/23).

13. As follows from the Kurtz Deposition (D/23), and from his testimony during the
arbitration proceedings, he paid the the Plaintif for the trials hundreds of thousands
of dollars, much more than stated and written in the agreements concluded by the
parties. This also refers to payments in regard to the Third Addendum - which form
the basis for the main claim in this case.

During his long and detailed testimony, Kurtz was chock full of arguments against
the conduct of the Plaintiff and its representatives in this affair, and he did not spare
them the rod of his sharp tongue.

As argued by him, he had been warned by his son in law, already at the outset of the
negotiations with the Plaintiff's representatives, Barenholz and Vigdor, that he was
dealing with a "bunch of crooks", a warning that was repeated later on, this time,
according to his statement, by Prof. Tova Chajzek herself.

Kurtz further argues that although the results of the first canine trial in 1990 had
been "excellent" - as he was also told by Barenholz - the latter told him that
scientists and people would "not believe" such good results of the research, and that
is was therefore necessary to continue the research also in regard to humans. Kurtz
argues that he understood from his conversations with Barenholz and Vigdor that it
would be possible to arrive at positive results regarding the application of the 314
Liposome for treatment of humans as an anti-aging drug within a very short period,
using the "short track", and not after many years and high financial investments - as
it turned out in reality.

Kurtz argues that the Plaintiff and its representatives mislead him all along,
repeatedlz concluded additional agreements with him, and extorted large amounts
of money from him - be it by the agreements themselves, be it in addition to them.
He, on his part, put his full and unrestricted trust in them, on the one hand, and
needed them, on the other hand, for the purpose of the research, particularly for the
supply of liposomes.

6

14. An additional argument brought forth by Kurtz was that as opposed to their obligations pursuant to the signed agreements, he never received, in real time, any report from Yissum or from Barenholz's laboratory regarding the progress, development and results of the trials. All the reports that he received - if any - were from other sources, but not from Barenholz - who violated the signed agreements, including the "Third Addendum".
Kurtz argues that he suspects that the Plaintiff and Barenholz in fact conducted the required research and trials, but concealed their results from him, and did not report to him accordingly.

## The Decision

15. In this phase, all I need to decide is whether the Defendant paid the Plaintiff the amount of $ 125,000 - in whole or in part -, as it had undertaken pursuant to the Third Addendum agreement, or whether this amount was not paid at all. At the same time I must relate to the validity of the Third Addendum agreement as a whole, in the light of the argument raised in the Counter-Claim, claiming that this agreement is invalid, as it was, according to Kurtz, "forced upon" him (section 38.a. of D/23).

After hearing the testimonies in this case, and after investigating the complete evidence, I came to the conclusion that Kurtz's tough and blunt arguments against Yissum and its representatives, such as "deceit", "misleading", "extortion", "coercion", etc., as he used, are not realistic.
These and other arguments are not at all based on the evidence presented before me, and they seem to me highly exaggerated and out of place. I fear that Mr. Kurtz got carried away a bit, in regard to his accusations and faultfinding against the Plaintiff and its representatives, and it seems that he was making, more than once, a mountain out of a molehill.

16. My impression is that both parties entered the project in question with open minds and good will, with a sober attitude, with the purpose of developing the 314 Liposome preparation, and bringing it to a state of commercial application. Both parties had a large and positive interest in the project - both from the scientific and the commercial aspects - and they wished for its success. The parties, their representatives and families, even created strong social ties, as follows from the testimonies, and it is difficult for me to assume that Kurtz would have tied bonds of friendship with somebody whom he conceived, already at the outset, as he argues, as a "bunch of crooks".
As opposed to the arguments of the parties' legal representatives - on both sides - my clear impression was that both parties signed the documents, and acted in accordance with them, in mutual agreement, out of common interest, and, most of the time, in good will and mutual trust, until the dispute broke out between them. I was convinced that Kurtz signed the agreement with a clear mind, with open eyes, and out of good and free will, and that he was not subjected to any pressure,

7

extortion, or coercion, to sign these agreements and documents, including the Third Addendum agreement, as argued by him. Kurtz's goal - like the goal of the Plaintiff and its representatives - was, as aforesaid, to try and develop the 314 Liposome into a medication, and to bring it to commercial production, and attempted to do this investing both scientific and financial efforts. I do not accept that Kurtz signed the Third Addendum on December 29, 1995, "under coercion", as he argues, and that he was prepared to pay $ 125,000 of good money without receiving appropriate and proper consideration. With all due respect, I don't think that Kurtz would have signed such an agreement without being convinced that he would enjoy significant economic benefits (and not for the glory of the Hebrew University, or for the glory of the State of Israel, as he argues).

17. I completely reject Infuturia's argument that Kurtz signed the Third Addendum under pressure and coercion, the reasons for the rescission of the agreement, as argued in sections 118 - 127 of its summation. There is no doubt that Kurtz was interested in a continuation of the research, and in its successful conclusion, and any investment made by him in the research was made out of free will, and in the clear knowledge of the purpose of these financial investments. Even according to his argument, Kurtz invested in the project hundreds of thousands of dollars - in many installments of various amounts, during the contractual relationship with Yissum, as specified in detail in his deposition and his testimony (see sections 5 and 6 of the Arbitration Decision, above). And behold, the Defendant's legal representative does not bring up any argument regarding all these amounts, and "reduces" the argument of coercion, based on section 17.a. of the Contract Law, to the Third Addendum alone (section 127.a. of the summation). How is that?

It is not clear to me at all, and it is not acceptable to me, how it could be, that all these many payments amounting, as aforesaid, to hundreds of thousands of dollars, were paid by Kurtz willingly and in mutual agreement - as follows from the agreements and the evidence in this case - and only the Third Addendum agreement was signed under pressure and under coercion, as he argues. In fact, even the Plaintiff's legal representatives admit in their summation, that the "saga of the exceptional payments" was brought up by Infuturia as a "gesture of goodwill" (section 121.b. of the summation) - and it is not logical, in my understanding, why this "goodwill" should have ceased to exist particularly in respect to the Third Addendum. I therefore determine that Kurtz signed the Third Addendum, too, out of his free will and with a clear mind - just as the previous agreements - and that there is no base and no foundation to the argument of coercion or extortion.

This is the time to note that Infuturia did not bring up the argument of coercion in its Counter Claim - which is rather detailed, and contains numerous and various causes for claim - and this fact speaks for itself.

18. I do not accept Kurtz's argument stating that he was, supposedly, told by Barenholz that the results of the first canine trials had been positive, and even "excellent", and *[sic! should be "as" - Translator's Note]* this stands in absolute contradiction to the written summary of the results, which state explicitly that there is concern

8

"regarding changes in the liver that would require further investigation". All this in the light of the high level of a number of substances in the blood (exhibit 3 of the Plaintiff's exhibits, page 14).

Kurtz's argument stating that he did not receive ongoing reports on the various trials also do not pass the test of reality, since a large number of reports submitted to Kurtz are found among the submitted evidence, and he himself admitted this, following the various trials (for example, exhibits 2 and 3 of the Plaintiff's exhibits, in the matter of the first canine trial; Annexes 22 and 23 of the Kurtz Deposition, D/23, in the matter of the Jerusalem Trial; Annexes 69, 70, 71 of the Kurtz Deposition, and more).

19. This is the time to note that although Mr. Kurtz was not proficient in the scientific field of the trials, my impression was that he is a wise and clever business man, who followed up closely after each and every one of the phases conducted in the research. Kurtz even received real time detailed reports on the various procedures, both from Yissum's representatives, and from other persons who dealt with the trials, such as Prof. Chajzek, and Dr. D'Affra.

It can be determined that, as a layman in the field of 314 Liposome research, Kurtz received ongoing data and reports, and he was a full partner - under the objective limitations set by his lack of proficiency - in all procedures that were planned and executed in the various research projects. As follows from the evidence as a whole, Kurtz even took rather active part in the various procedures, and it was even he who initiated the Milan Trials, in which his son-in-law participated. During the arbitration proceedings I received a broad picture of Kurtz's comprehensive and wide ranged activities in his attempt to distribute the new medication in the various countries of the South American continent, as well as in Germany - whether it is a medication based on the 314 Liposome, or not, as he argues. This fact, too, points, as I see it, to Kurtz's proficiency in regard to the material. Whichever way it is - I did not at all receive an image of Kurtz as a hapless victim in the face of a bunch of crooks and extortionists, who deceived him all along the way. Neither the one nor the other!

Therefore I came to the conclusion that the agreements concluded by the parties were signed appropriately, in mutual agreement, without constraint or coercion, and are therefore valid, and binding to the parties. The aforesaid refers to all the agreements that were concluded, beginning with the License Agreement, including the Third Addendum.

20. From the evidence that I have further follows that the two Parties in this case had practically led a "double" relationship in regard to the payments that Kurtz was requested to make for the research of the 314 Liposome.
On the one hand – the Plaintiff arranged with Kurtz a number of written agreements, where he undertook to make various payments – and which he fulfilled completely.

9

On the other hand – he was constantly asked to pay the Plaintiff additional payments for overhead, lab maintenance, grants for the university, and so on, which he also paid, again and again.

It may be determined that on the side of the "written law", which was formed in various agreements concluded between the two, the Parties also acted by an "oral law", pursuant to which Kurtz would slip into the Plaintiff's hand additional high amounts, following their representatives' requests, paricularly of Prof. Barenholz, for different and various purposes, as aforesaid.

21. The central question I am faced with in this phase of the decision is, seemingly, simple, and it is: Did Kurtz pay the various payments after December 29, 1995, on account of the Third Addendum agreement; or were these different and separate payments, for other purposes, beyond was what agreed upon in the Third Addendum?

After careful review of the evidence, and after having carefully read the argumentations of the Parties' legal representatives, I have come to the conclusion that law and justice are with the Defendant's position, therefore the various amounts paid after December 29, 1995, are to be set against the Defendant's financial obligations arising from the Third Addendum.

These are my reasons:

a. Reading the Third Addendum, in its literal wording and its intention, it is possible to have the impression that after five years since the beginning of the mutual relationship between the Parties, and without the trials, probably, having brought forth any material results – they decided to once again put the agreements between them in writing. Section A of the agreement sets forth and summarizes the Plaintiff's obligation "to continue to perform" the scientific research on the liposome, including human and animal trials. Section C of the agreement obligates the Defendant to pay the Plaintiff an amount of $ 125,000 for such additional work.
   Nowhere in the agreement is it either stated nor hinted at that in addition to the amount agreed upon in Section C, the Defendant would be required to pay the Plaintiff tens of thousands of Shekel for overhead, lab maintenance, grants, wages, etc.

b. I believe Mr. Kurtz that he believed, when he signed the Third Addendeum, that the amount of $ 125,000 set forth therein, included the process of all of the continued trials, with everything they involve, and that he would not be requested to pay any additional amounts. It seems to me that any reasonable person would also have the impression that it is the purpose of the Third Addendum to conclude and exhaust the relationship between the Parties from that point onward, and that it contains no mention or hint to any additional

10

payments for other services, to be paid by the Defendant from time to time, as is argued by the Plaintiff.

c.  The Plaintiff's attempt to rely on Kurtz's letters, where he repeatedly mentions his obligation to payment of $ 125,000 as proof to the fact that this amount had not been paid (see Plaintiff's exhibits 11 – 15, as specified in the Litvin Deposition – P/8) – will not succeed, in my eyes.

It all that may be derived from said letters is that Kurtz does not deny his obligation to payment of $ 125,000 pursuant to the Third Addendum, but it cannot be followed from them that Kurtz admits to the existence of the debt as a whole, at that time.

This point is particularly evident upon review of exhibit 15 of the Plaintiff's exhibits, where Mr. Kurtz notes that he is "obliged" to pay an amount of $ 125,000, while there is no ispute between the Parties that at that time Kurtz had already paid $ 15,000 on account of the Third Addendum, and this is also accepted by the Plaintiff (see also exhibit 22, in similar wording).

d.  A significant part of the checks settled by Kurtz after December 29, 1995, bear a note in his handwriting in the English language, stating "The payment is for the Third Addendum, signed on December 29, 1995"; in English: "Payment per third Addendum to license agreement dated December 29, 1999 *[sic! – should be "1995" – Translator's Note]*".

(see D/18; Annex 67 of D/23).

It shall be noted that the aforesaid remark, in Kurtz's handwriting, also appears on checks for the amount of $ 8,000, in reference to which the Plaintiff argues, as remembered, that they were paid for overhead, in addition to the $ 125,000, to which the Third Addendum relates.

The aforesaid note on the various checks considerably supports Kurtz's version. The Plaintiff's argument, according to which: "There is nothing remarkable about this, since the note could have been made retroactively" (section 58 of its summation) – is unfounded, and there has not been brought forth even a  hint of evidence that this was actually the case. Such a possibility was also not presented to Kurtz during his thorough and exhaustive cross examination.

22.  From the compilation follows that relying on the evidence before me it has been proven that Kurtz paid the Plaintiff – on account of the amount of $ 125,000 as set forth in the Third Addendum – an amount of $ 92,545, and I give preference, in this matter, to the Defendant's position over the Plaintiff's position.

The Defendant's remaining debt thus amounts to only $ 32,455, and I hereby obligate it to pay this amount to the Plaintiff, with the statutory interest for dollar currency.

11

Since the Plaintiff had no reason to cancel the agreement, as the postponement of payments on account of the various agreements had occurred in the past as well – I hereby reject the Plaintiff's request to declare the cancellation of the agreement, or to cancel it, as requested in section 84.1 of the written summation.

It must be pointed out that the Defendant invested in the project in question hundreds of thousands of dollars during a good number of years, and the remaining debt of $ 32,455 did not justify the notification of cancellation of the entire license. Moreover – the Plaintiff's claim against the defense concentrates solely on its violation of the "Third Addendum" agreement of December 29, 1995 – as opposed to the License Agreement of March 19, 1990. It is therefore not clear to me, based on what, and why, the Plaintiff wishes to cancel the License Agreement as a whole, and to deny the Defendant its rights arising thereof, which he had purchased by full and significant payment of hundreds of thousands of dollars.

The request for declaration of cancellation of the agreement or agreements – is hereby rejected.

In addition, I reject the remaining requests set forth in the statement of claim and in the summation, since they all derive from the argument that the agreement had been cancelled in a lawful manner – which is not the case. I hereby accept the request to split remedies, as requested in section 84.7 of the summation, in the event that the remedies result from other reasons that were not tried in the framework of this arbitration.

### The Counter-Claim

23. Infuturia – the Counter-Claimant -- submitted a Counter-Claim over the amount of 45 million US dollars against Yissum (the counter-defendant), arguing a violation of contract on its part, which resulted in heavy damages to the Counter-Claimant. Infuturia substantiates the Counter-Claim on four bases, as set forth in section 12 of the statement of counter-claim, as follows:
    a. Yissum and Barenholz failed to report to Infuturia about the Milan Trials and their results.
    b. The Counter-Defendant's function and conduct following, and as a result of, the Milan Trials, in what is called the "Doxil Affair".
    c. The function and conduct of the Counter-Defendant and Barenholz in regard to the Jerusalem Trials.
    d. The Counter-Defendant's failure to report to report to the Counter-Claimant on the Jerusalem Trials.

24. Infuturia specifies in detail its arguments against Yissum regarding, as Infuturia sees it, its inappropriate conduct in the framework of the relationship between the two. It argues that during the Milan Trials in 1992 it became clear – for the first

time – that the 314 Liposome has a long circulation time in the human body. However, Yissum did not report this important discovery to it until the end of 1996, beginning of 1997.

Infuturia further argues that following the discovery during the Milan Trials, that the 314 Liposome is a liposome with an extended circulation time in the human body, Barenholz " clandestinely developed Doxil, a long circulating liposome loaded with a generic chemical anti-cancer agent by the name of doxorubicin " (section 23 of the statement of claim). Infuturia argues that from 1992 until today, Barenholz and the Hebrew University, together with a company named "Sequus", continue to cooperate with Yissum in the development, manufacture and marketing of Doxil, without sharing the profits with the Counter-Claimant.

25. Regarding the Jerusalem Trials, the Counter-Claimant argues that despite the continued trials, in cooperation with "Hadasit" and Prof. Tova Chajzek-Shaul, Yissum failed to transfer to it written reports regarding the trials and the tests that were conducted on the blood samples of the participants.
The Counter-Claimant further argues that: "the Jerusalem Trials were planned by the Counter-Claimant and/or by Barenholz, its associate, and were conducted with dosages which, on the one hand, were dangerous and/or inappropriate, and on the other hand, uneffective and/oder non-beneficial, all that with the purpose of abolishing, distorting and neutralizing any additional scientific-investigative benefit the Counter-Claimant could have obtained from them." (section 45.a. of the Statement of Counter-Claim).

The Counter-Claimant assesses the total damage caused to it at $ 45,441,950, as specified in sections 51 – 56 of the Statement of Counter-Claim.

26. Yissum argues in its defense that the characteristics of the 314 Liposome on the one hand, and the Doxil Liposome on the other hand, differ fundametally, and that "there is not one similar characteristic between them, certainly not in their chemical composition" (page 3 of the Statement of Counter-Defense). Yissum further argues that there is a significant time gap between the respective times of the developments of each of the aforesaid liposomes, and that "there is no actual common base or reason for the argument of dependence in the matter of the different liposomes" (page 6 of the Statement of Counter-Defense). Yissum emphasizes that the connection with Infuturia was only established in 1990, at a time when the Doxil Liposome existed and was known, and had even been tried on animals in the past. As to the Jerusalem Trials, Yissum argues that they were conducted under the responsibility and full control of Dr. Chajzek, and that the final decisions regarding these trials, including the determination of the doses, the choice of the hospital and the trial schedules, were done by her.
It is also argued that the Counter-Defendant received continuous and full reports from Prof. Chajzek on the process of the trials, and that it was involved in the way they proceeded.

13

### The Doxil Affair

27. The main and central argument brought forth by the Counter-Claimant in the statement of counter-claim against Yissum is that during the Milan Trials it became clear that a "sensational discovery" has been made, according to which the 314 Liposome has a circulation time in blood of 7 – 8 days from the moment of its injection into the human body, and this is the first time ever that a liposome of any type demonstrated the ability of such a long circulation time within the human body.

   Bast on this new and sensational discovery, the Counter-Defendant, with the help of Barenholz, developed the Doxil Liposome, in secrecy, behind Infuturia's back, and without including the latter in the manifestation of the aforesaid patent, and consequently also without sharing with it the profits that were derived thereof.

   After having carefully examined the evidence related to this affair, and after having read the summations of the Parties' legal representatives – which were formulated in remarkable thoroughness and depth – I came to the conclusion that the claim regarding the Doxil must be rejected, and I shall specify my reasons hereafter. It must be noted that the findings and the conclusions, which I reached in my aforesaid judgement regarding the main claim – are true and effective also regarding the Counter-Claim, and there is no reason to repeat them here.

   I found no real congruence or similarity between the 314 Liposome and the Doxil Liposome – neither in substance nor in the aspect of time, as it followed from the evidence in this case, and the argument stating that the Doxil Liposome was developed, improved, or invented before the background or following the 314 Liposome – has no basis in the evidence that is before me, and it must therefore be rejected.

28. From the aspect of substance – Following precise examination of the evidence and the Parties' arguments I arrived at the conclusion that there is an essential difference between the 314 Liposome and the Doxil Liposome, to the extent that the Counter-Claim cannot be allowed on the grounds of the argument of identity or similarity between the two. In this point I fully adopt Prof. Barenholz's testimony, which was detailed, well founded and absolutely credible, regarding the utterly scientific difference between the two aforesaid liposomes, among others in the parameters of composition and characteristics of the fats, the size of the liposome, the preparation method, etc.
   In his deposition (P/3), and during his testimony before me, Barenholz described in great detail the significant differences between the two aforesaid liposomes, and there is no need to state them again in this decision. This is the place to point out that while the 314 Liposome is designed to extract cholestrol from body tissue, and to remove it from the blood cycle, the Doxil Liposome constitutes a means of

14

transport for medications into the body, while the liposome itself, without the medication, is merely a transport medium, without any medical influence. In section 76 of his deposition (P/3), Barenholz presents a fundamental and detailed comparison between the 314 Liposome and the Doxil Liposome (Patent 556) – the main points of which he also repeated during his testimony in court *[sic! – Translator's Note]* – and I accept his conclusions.

I decided to adopt Barenholz's unequivocal determination, whereby: "When we compare the characteristics of the liposomes, we discover that there is not one similar characteristics between them, certainly not in their chemical compound" (P/3, section 76).

I further determine that the testimonies or the expert opinions on behalf of the defense did not succeed in destroying or damaging Barenholz's professional and unequivocal expert opinion, and it is acceptable and trustworthy to me, as aforesaid, without reservation.

29. <u>From the aspect of time</u> – The Counter-Defendant succeeded in proving that the 556 Liposome, which is the Doxil Liposome, was invented and developed significantly earlier than the alleged "sensational discovery" of the Milan Trials, which were conducted in 1991.

From the evidence presented before me follows that the 556 Liposome was submitted for registration already on October 20, 1989, i.e. some two and a half years prior to the Milan Trials (see Annex 35 of the documents submitted on behalf of Yissum). The patent registration states that the size of the liposomes that they used, and registered the 556 Liposome, moved between 50 and 100 nm – a fact that removes the foundation of the Claimant's argument, whereby the Stealth Liposome of that size originated in the Milan Trials (it should be noted that the size of the 314 Liposome is around 50 nm and less).

Additional evidence supporting the defense's position is the "Abstract 318", which was prepared for a major medical conference that took place on May 17-19, 1992, in San Diego, California (see Annex 35 of the documents submitted on behalf of the Yissum). The aforesaid "Abstract 318" states explicitly that a halflife of the liposome in blood was discovered in the Doxil preparation, exceeding in most patients the circulation time of seven (7) days.

There is no doubt that the "Abstract 318" was published <u>prior to</u> the Milan Trials on the 314 Liposome, and did not rely at all on the findings and results of said trials. From the deposition of Prof. Gabizon, the trustworthiness of whom I have no reason to doubt (page 73 of the protocol), and from documents submitted by Yissum, follows clearly that most of the patients that were treated by him, were treated in the course of the trials in the period of May-October 1991, i.e., a long time prior to the Milan Trials, which were conducted in 1992.

It seems that Infuturia's legal representatives were aware of this difficulty, and therefore turned the arrows of their cross examination to an effort to prove that the treatments were in fact conducted during 1991, but were published only one year

15

later – an argument that was wholly rejected by Yissum's witnesses, and I accept their position.

It is most logical and reasonable, from my point of view, that the results of the trials that were conducted in 1991 were published (even if without a date), immediately, and close to the date of their performance, and not one year after they were conducted, according to the Claimant's unreasonable argument.

Finally, in this matter – I was convinced that Prof. Gabizon's trials with Doxil in Jerusalem were completed, and their results published, during 1991, even before the Milan Trials began, and that the "Abstract 318" was in fact based on Prof. Gabizon's trials in Jerusalem.

30. An additional and major piece of evidence, according to the Counter-Claimant's point of view, proving the "sensational discovery" of the Milan Trials, is a telephone conversation that took place in June 1992 between Kurtz and Barenholz. Kurtz argues that Barenholz told him during said telephone conversation, that: "the tests that were conducted on the Volunteers' blood samples showed (for the first time ever) that the 314 Liposome circulated in their blood for 7-8 days (hereinafter: "the Discovery"), and that no negative reactions to the infusions they had received were detected" (Deposition Kurtz D/23, section 18.a.).

The Counter-Claimant argues that the fact of this important telephone conversation, during which Barenholz practically admitted the sensational discovery of the results of the Milan Trials, presents decisive evidence in support of the Claimant's version. Infuturia argues that despite the fact of the aforesaid telephone conversation was specified in the statement of counter-claim (section 13.e.) – it was not denied either in the statement of counter-defense, or in Barenholz's first deposition (D/3), and was mentioned only in his second deposition (P/4). This development of events - according to the Claimant's position - makes one wonder, and casts significant doubt on Barenholz's version denying the aforesaid conversation.

31. Prof. Barenholz absolutely denies the existence and contents of the telephone conversation. He states that the aforesaid telephone conversation: "never took place, and I never told him (Kurtz) the things that he claims that I told him. The discoveries related to the Milan Trials by Mr. Kurtz never existed, were never discovered, were never examined by me, never occured, never took place, and were never said - neither the one, nor the other" (Deposition P/4, sections 20-21). Can there be any more complete and absolute denial that this.

32. The decision in the question of the existence or non-existence of the telephone conversation between Kurtz and Barenholz in June 1992 – including the contents of the conversation – is based on the determination of the trustworthiness of one of the two aforesaid versions. After having carefully examined the statements, and in the light of my direct and immediate impression of the witnesses that appeared before me – I was not convinced that Barenholz in fact said the things that he is claimed to have said, and I have difficulty in preferring Kurtz's version over that of Barenholz. Even if the scales of the balance remain even, but since the burden of proof lies

16

with the Claimant - the Counter-Claimant did not live up to this burden, and I reject its version in regard to the contents of the aforesaid conversation.

In the light of my aforesaid conclusions regarding the absence of any connection – both from the aspect of substance and from the aspect of time – between the 314 Liposome and the development of the Doxil Liposome, I see no need in further discussion of the various arguments that were brought forth in this matter, such as, whether the blood samples that arrived in Milan were frozen, or not; Prof. Scherphof's expert opinion in this matter; claims of change of front, etc.

Therefore, in the matter related to the Doxil Affair, the Counter-Claim is hereby rejected.

### The Milan Trials

33. The Counter-Claimant brings forth many complaints regarding the conduct of Yissum and Barenholz in connection with the Milan Trials and their results. For example, the Counter-Claimant's legal representatives argue that Yissum did not report to it about these trials, contrary to the agreement concluded with it, and that it "concealed" from it the fact that the "308 Patent", which talks about a significant reduction of blood pressure, had been submitted for registration (Counter-Claimant's summation, section 69 and further).

34. Regarding the issue of reporting the Milan Trials, I was convinced by the evidence that Kurtz received ongoing reports on the trials, in which his son-in-law even participated, and that he was updated and informed regarding their results. It is true that Barenholz did not report to Kurtz in writing on the results of the trials, because, as the latter *[sic! - Translator's note]* stated: "there was nothing to report about… Also, since the trial was conducted by the Italian researchers and not by Barenholz" (section 18 of the statement of counter-defense; Barenholz Deposition - P/3, section 35; pages 159-160 of the protocols). Barenholz argues that despite of that, he reported to Kurtz orally about the Milan Trials, and thus, so it seemed to him, he fulfilled his obligation. As he states: "… what was I going to record? I did nothing, what was I going to report on, on Dr. D'Affra? (the Italian physicial - A. S.)" (page 160 of the protocols).

Second, there is no dispute that the person who conducted the trial, Dr. D'Affra, submitted to Kurtz two rather detailed reports on the procedure of the trials (D/23, Annexes 22 and 23). Kurtz confirms that he received the reports from Dr. D'Affra, and he even testified that he himself passed the reports on to Prof. Barenholz.

I believe that the Counter-Defendant fulfilled its obligation to report on the process of the Milan Trials and their results, both in written reports submitted by Dr. D'Affra to Kurtz, and by oral reports and conversations that took place between Kurtz and Barenholz on the subject. Since the trials were performed by physicians

17

in Italy, without the participation of Prof. Barenholz, it is not clear what he should have reported to Kurtz, who received, as aforesaid, ongoing reports on the issue from Dr. D'Affra.

This the place to refer also to my statements in section 19 of this Arbitration Decision, regarding the involvement and ongoing and intensive update of Kurtz in all the procedures of the trials in this case, including the Jerusalem Trials and the Milan Trials, and these statements are applicable to this present issue as well.

35. Regarding the discovery of the "308 Patent" in the Milan Trials and its registration - I did not receive any proof that this was done behind Kurtz's back and without his knowledge. In the light of my aforesaid determinations and conclusions, in regard to Kurtz's knowledge and involvement in all the trials and procedures, it seems reasonable to me to assume that Kurtz was informed and aware of the discovery of the 308 Patent during the Milan Trials and its lawful registration. Yissum argues that this was not concealed, and that Kurtz even paid the expenses for the aforesaid patent registration (sections 164-166 of the summation of the Counter-Defendant).

In any case, the legal situation regarding the rights to Patent 308 - as is true regarding all the other patents discovered and/or registered following the common trials conducted by the parties - is as set forth in the agreements concluded by the parties, particularly the License Agreement that the parties concluded on March 19, 1990, and the unilateral cancellation of which by Yissum was illegal, as I determined earlier (section 22 of the Arbitration Decision). That is to say: Even if the patent was registered by Yissum or Barenholz, the owner of the license to the patent and the right to its commercial distribution is Infuturia - as set forth in the License Agreement (Annex A of D/23).

### The Jerusalem Trials

36. The Counter-Claimant's legal representatives bring forth various complaints against Yissum in connection with the "Jerusalem Trials", which were conducted, as aforesaid, during the years 1992-1993, in cooperation with Prof. Chajzek-Shaul, and following an agreement that Kurtz had concluded with Hadasit.

After having reviewed the evidence, and after having read the parties' arguments, I came to the conclusion that the Counter-Claim, also regarding this affair, is completely unfounded.

As I determined above (sections 15-17 of the Arbitration Decision), Kurtz concluded all the agreements with Yissum, including the Third Addendum, in clear knowledge and with open eyes, without any coercion, force, misleading, and other various and strange arguments which Kurtz remembers to bring up in a rather late phase, as must be admitted.

As set forth earlier, Kurtz received ongoing and updated reports regarding every phase of the trials, and he was at all times aware and informed about them (see section 19 of the Arbitration Decision). It should be noted, in addition, that from my direct and immediate impression during the extended deliberations of this case, was

18

also, that a sharp minded and experienced businessman such as Kurtz would not fail to receive ongoing reports, and be at the hub of the matters during the trials - as, in fact, he was.

37. I fully adopt Prof. Barenholz's testimony, whereby: "All the reports that were produced during the term of the License Agreement were submitted to Kurtz, either by Prof. Chajzek or by me, amongst them reports relating to the Jerusalem Trial, as follows: ... It should be noted that in a later correspondence (further below), Kurtz confirms that he received all the reports regarding the ten test persons of the Jerusalem Trial" (Deposition P/3, section 46).

My impression is that the argument regarding the lack of appropriate reports (both regarding the Jerusalem Trials and other trials, where this argument arises) - when the argument has never been raised in the past during the many years of activity and cooperation between the parties - is a very weak support and serves the Counter-Claimant as a pretext on which to base its claim, at any price - an attempt that is bound to fail, as I see it.

38. I also did not find any foundation regarding the remaining elements of Infuturia's arguments against Yissum, in the Jerusalem Trials affair, including the "failure of consideration", theft of patents, negligence, etc. etc.
I'm afraid that what we have before us is a "failure of claim", not a failure of consideration, or of any of the other failures referred to the Counter-Defendant. Based on the evidence in the case it can be determined that the Counter-Claimant received, in the Jerusalem Trials, full consideration for its money, as follows from Prof. Chajzek's detailed reports, even if those reports did not lead to the results which Mr. Kurtz had hoped for.

Also unclear to me is the source of the claim of "patent theft", when according to the License Agreement Infuturia was - and remains - the owner of the license and the owner of the right to commercialize the patent, as even Yissum's legal representatives admit in their summation to the Counter-Claim (section 249). As I decided above, the License Agreement had been unlawfully cancelled, with all the implications arising thereof, from the legal aspect (see sections 22 and 35 of the Arbitration Decision).

I also found no basis regarding the argument of alleged "negligence", and I determine that Prof. Chajzek performed the trials with appropriate skill and professionalism, and all attempts by the Counter-Claimant to polemicise and to argue about the way and style of the conduct of the trials is unfounded. All arguments regarding the Jerusalem Trials are hereby rejected.

## Arguments of Misleading

19

39. The Counter-Claimant continuously repeated - both during the hearing of the evidence in this case, and in the detailed summations - its argument regarding the misleading of Kurtz by Yissum and Barenholz regarding the essence of the trials, their duration and their results.

For example, Infuturia argues that Yissum acted "with the intention of fraudulence on its part, in connection with the possibility of turning the patent into a medical preparation, taking the short route..." (section 51.a. of the summation), whereby, so it argues, if Kurtz had known that it would be a long route of many years, he would not have embarked "upon this escapade".

An additional misleading by Yissum - according to Infuturia's legal representative - lies in the fact that Kurtz "was mislead by Yissum in that it presented before him, prior to the conclusion of the License Agreement, the patent as applying (also) to humans, although it was inapplicable for the use on humans, and has never been permitted as such" (section 63 of the summation).

40. I examined Infuturia's claims of misleading against Yissum with serious consideration, and I found no basis for them at all, as set forth also in this Arbitration Decision (sections 16-19), and there is no need to repeat the statements made.

From reviewing the evidence in this case, and from the correspondence between the parties, follows that Yissum had told and written to Kurtz that it would be a gradual process, beginning with trials on animals, and continuing with human trials.

Every reasonable and sensible person - even someone unfamiliar with the detailed and the details of the trials and research - can easily understand that procedures of discovery and development of the patent constitute, by their nature and character, a gradual and extensive procedure. This is not the place to repeat the details of the individual phases of the various trials, but from them follows, obviously, that the issue is trials and research projects that take considerate time.

Kurtz therefore had no objective basis for thinking - and the Defendant never, at any phase, caused him to think - that the issue is one of flash quick trials, in the sense of "hit and done", that would provide, within a few months, recovery and healing to all the needy, or large amounts of money to all those involved.

41. The argument of the "second" misleading, regarding Kurtz's "conviction" that the issue is a patent that is applicable to humans, as it was presented to him by Yissum - that, too, is unfounded. From reading the first article in the New York Times alone follows that the issue is a treatment method for "animals" (P/9). Also in additional documents, including the abstract for the 314 Patent (Annex 40 of the Plaintiff's exhibits), follows that the issue is a patent that is applicable to animals, not to humans, at least in its first stage.

I also accept Prof. Barenholz's testimony, stating that patents that are applicable to humans can be issued and received only following clinical trials on humans, and there is no doubt that Kurtz, too, knew, or should have known, that as long as no such trials had been conducted, the preparation cannot be used on humans.

20

I therefore found no basis for the claim of misleading brought forth against Yissum, and, as I determined earlier, Kurtz was involved in all stages of the trials, and he knew their nature, procedure, results and implications very well.

42. In section 57 of the Counter-Claim, Infuturia requests the "splitting of remedies, so that he will be able to submit a claim for additional compensation for damages that he will still incur in the future because of the Doxil affairs, and which have not yet been consolidated". It repeats this request in section 179 of its summation.

From my determination that the Counter-Defendant bears no responsibility in the Doxil affair, and the Counter-Claim was rejected, follows that there is no room to impose any damages on it, and there is no room to grant the remedy of splitting of remedies regarding any future "claim for additional compensation for damages". The request is hereby rejected.

## Conclusion

43. The main argument of the claim Yissum versus Infuturia is partly accepted, and I obligate Infuturia to pay Yissum the amount of 32,455 US dollars, plus statutory dollar interest, beginning with the day on which the statement of claim was submitted to the arbitrator.

Infuturia's Counter-Claim with all its elements is herewith rejected.

44. In the light of the rejection of the Counter-Claim in its entirety, and only partial acceptance of the main claim, there shall be no awarding of costs, and each party shall bear its own expenses.

**Issued on May 21, 2006, in absence of the parties, sent to the parties by registered mail.**

(Signature: illegible)
Amnon Strashnov, Arbitrator